(No. 51134.

SMITH'S TRANSFER CORPORATION, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Helen Shamblin, Appellee).

*Opinion filed June 29, 1979.*

Musschoot, Womack & Galich, of Chicago (Arthur R. Musschoot, James W. Womack, and Andrew A. Galich, of counsel), for appellant.

Seyfarth, Shaw, Fairweather & Geraldson, of Chicago (Robert H. Joyce and David J. Parsons, of counsel), for appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

This is an action under the Workmen's Compensation Act (Ill. Rev. Stat. 1977, ch. 48, par. 138.1 *et seq.*) brought by a widow to recover benefits for the death of her husband. The arbitrator, in a decision adopted by the Commission, awarded compensation, and the circuit court of Cook County confirmed the award. The cause is brought to this court under Rule 302(a) (58 Ill. 2d R. 302(a)).

The employee in question, Ray F. Shamblin, was a dispatcher with the respondent company, Smith's Transfer Corporation, in Chicago. He worked the midnight shift, requiring that he work from midnight to approximately 8 or 8:30 a.m. On June 28, 1973, he suffered a fatal heart attack while at work. His widow and claimant in this cause, Helen, prosecutes this action, alleging that her husband's death was caused, at least in part, by his job.

Several evidentiary issues are raised by the parties' arguments. A complete recitation of the evidence is necessary.

Relevant facts preceding Shamblin's last workday were provided by the testimony of his wife, the claimant Helen Shamblin. In June of 1967, the first year of his employment by respondent, Shamblin broke his leg while

at work, and a blood clot developed in the leg. A vein stripping was conducted in 1972, and some veins were removed from the leg. Blood thinner was thereafter prescribed because he was found to be susceptible to clotting.

On June 27, 1973, the day before his death, Shamblin arrived home from work at approximately 10 a.m. He had coffee with Mrs. Shamblin and then slept for three or four hours. Upon awakening, he and Mrs. Shamblin took their son to an appointment with a psychiatrist. At approximately 4 p.m., after returning home, Shamblin returned to bed and slept until approximately 8 p.m. He then had dinner and watched television until he left for work at approximately 11 p.m. According to Mrs. Shamblin, her husband appeared normal on this day.

Harriet Jendrach, a fellow employee of Shamblin, was next called by claimant to testify. She appeared pursuant to a subpoena. In her testimony she told of her contact with Shamblin on the day of his death, June 28, 1973. She first testified that she arrived at work shortly after 5 a.m. that day and noticed that Shamblin's face was grayish in color.

At this point in her testimony, Mrs. Jendrach responded negatively to certain questions posed by claimant's attorney and asserted a lack of knowledge as to others. The attorney moved to have her declared hostile, alleging lack of cooperation by the witness. Mrs. Jendrach admitted that she was reluctant to testify and that she once had refused to accept a subpoena obtained by claimant's attorney, but the arbitrator refused to declare her hostile.

In response to further questioning by claimant's attorney, Mrs. Jendrach did testify that Shamblin was behind in his work on the day of his death and that she helped him with it. When asked if Shamblin had conducted a "yard check," the witness said that she did not know. A

yard check entails moving about the company's yard area and checking trucks for freight information. She was then asked if she recalled a conversation with claimant's attorney, approximately one year earlier and shortly after Shamblin's death, in which she stated that Shamblin did make a yard check. She said that she did not. At this point, claimant's attorney again unsuccessfully moved to have the witness declared hostile. In response to another question, the witness said that she did not know whether it was Shamblin's duty to check trucks in the yard.

Claimant's attorney briefly changed the focus of his inquiry to a conversation between Shamblin and Mrs. Jendrach at approximately 5:30 or 6 a.m. on the day of Shamblin's death. According to Mrs. Jendrach, Shamblin had said that he was not feeling well and that he wanted to rest for a while.

The attorney then returned to questioning the witness about yard checks and alleged inconsistent statements. She was first asked if she recalled a conversation with Mrs. Shamblin on the night of Shamblin's wake. She indicated that she did not recall such a conversation. She was then asked if she recalled telling Mrs. Shamblin, at her husband's wake, that Shamblin was behind in his work, was under stress, and was running through the yard checking trucks. She responded negatively.

The questioning then returned to the events immediately following Shamblin's statement that he was not feeling well. Mrs. Jendrach testified that Shamblin sat in a chair and asked for water, but that, before receiving the water, he asked to have Willie Green, another fellow employee, take him to the hospital. Shamblin then walked to Green's car. According to Mrs. Jendrach, Shamblin's face was a grayish color at this time, approximately 6:30 a.m.

Willie Green, who drove Shamblin to the hospital, was the next witness called by claimant to testify. He first saw

Shamblin at approximately 4:30 a.m. on June 28, and he testified that Shamblin looked well and was in a good frame of mind. According to Green, Shamblin's appearance did not change during the next couple of hours, but he was pale when Green took him to the hospital at 6:30 a.m. Shamblin told Green that he was experiencing chest and shoulder pains unlike any he had before. When they arrived at the hospital, Shamblin was massaging his shoulder, opening and closing his fist, and making sounds which would indicate that he was in pain.

Green, in his testimony, also related Shamblin's activities while at work that day. According to Green, Shamblin worked on files and on a teletype machine, and he conducted a yard check of trucks. On cross-examination, however, Green admitted that he did not see Shamblin conduct a yard check. His testimony on direct examination, that Shamblin had conducted a yard check, was apparently hearsay. Green did not relate details of Shamblin's alleged yard check, nor did he testify that Shamblin was subjected to any sort of stress or exertion on the day of his death.

Following testimony by a witness that is not relevant to the purposes of this appeal, Helen Shamblin returned to the stand and related her version of a conversation that she had with Mrs. Jendrach at Shamblin's wake. The respondent's attorney objected to such testimony on the ground that claimant was attempting to impeach her own witness, Mrs. Jendrach. Claimant sought to justify the testimony as an attempt to show a prior inconsistent statement by Mrs. Jendrach, and argued that such evidence is admissible as substantive evidence under a hearsay exception and that such evidence is also admissible for impeachment purposes. The arbitrator overruled respondent's objection and allowed the witness to testify.

The witness, Helen Shamblin, said that Mrs. Jendrach had told her that Shamblin was running around the yard

checking trucks, that he started to perspire, and that he said that he was behind in his work and had not eaten. The witness also said that Mrs. Jendrach told her that Shamblin started to eat a sandwich and that Mrs. Jendrach cautioned him not to eat too much. Mrs. Jendrach allegedly also told Mrs. Shamblin that Shamblin became so ill that Mrs. Jendrach offered to hold him up, that he refused her help, and that he said that he could not raise his arm.

The last two witnesses to testify were Dr. Nathaniel Greenberg, on behalf of claimant, and Dr. William Brice Buckingham, on behalf of respondent. Dr. Greenberg responded affirmatively to the following hypothetical question:

> "Assume a *** 51-year-old male [in good apparent health], *** married with two children, who reported to work on June 28, 1973 for his regular midnight to eight-thirty a.m. shift job. ***
>
> That his appearance at four-thirty a.m. on June 28, 1973 was good. That he was performing his work as a dispatcher, and *** had fallen behind in his work, and as a result had sought assistance. That a co-employee had assisted the hypothetical man in his work duties that evening.
>
> That during the evening the hypothetical man made a yard check by running around getting numbers from trucks, and he broke out in perspiration, and explained to the co-employee that he was so far behind in his work.
>
> That [at] five o'clock or five-thirty a.m. his color became gray in appearance, and that was not his normal color. That between five-thirty and six a.m. the hypothetical man told a co-employee he didn't feel good, and wanted to rest for a while.
>
> That shortly thereafter he drank a glass of water, and then requested to be taken to Christ Community Hospital. That his color remained grayish in appearance.
>
> That *** the hypothetical man [was taken by car] to the hospital at approximately six-thirty a.m.
>
> That the hypothetical man complained of having chest and shoulder pains like he never had before. That the hypothetical man was experiencing *** pain, and was

massaging his shoulder, and opening and closing his fist.

That the hypothetical man was admitted to Christ Community Hospital at [six] fifty-five a.m., complaining of chest pain and pain in both arms.

That the course of treatment for the hypothetical man is reflected in Petitioner's Exhibit No. 6, which you have reviewed.

That he had a cardiac arrest as reflected in the hospital records, and that he was pronounced dead at approximately eight a.m.

Now, Doctor, do you have an opinion, based upon a reasonable degree of medical and surgical certainty, as to whether the hypothetical man's work activities which I have described to you in the hypothetical question could or might have been a causative factor and condition of ill-being described in the hypothetical which resulted in his death?"

The bracketed and deleted portions represent matters which were amended or stricken pursuant to objection or which were changed to correct minor errors. The doctor's response, in full, was "[t]hat the physical and emotional pressures of the job as described in the hypothetical question during that night resulted in the fatal myocardial infarction."

Respondent's attorney moved to strike the witness' reference to emotional stress, saying that there was no such evidence in the record and that the doctor's reference to emotional stress was impermissibly based on inference rather than evidence in the record. Claimant's attorney opposed the motion to strike on the ground that an inference of emotional stress was justified because of testimony in the record that Shamblin was behind in his work and required assistance from a fellow employee. Claimant's attorney further stated that the arbitrator would make the ultimate decision on whether emotional stress was present. Following these arguments, the motion to strike was overruled.

When asked for the basis of his opinion, Dr. Greenberg replied:

> "There are several items in the hypothetical question that already mentioned the man was behind in his work, he sought assistance, and he was running around getting numbers from trucks. This certainly indicates that he was under pressure to complete a job, to catch up with his work. That obviously is tantamount to emotional stress. This coupled with the physical stress involved in running around resulted in this fatal myocardial infarction."

On cross-examination, Dr. Greenberg reiterated that the basis of his opinion was that Shamblin was behind in his work, required assistance, and was running around the yard. According to the witness, Shamblin's activities involved both physical and emotional stress. He further testified "that the need for haste implies emotional stress." When asked on cross-examination whether his response would change if Shamblin were merely working on the teletype on the day of his death, the witness said that it would be difficult to formulate an opinion.

Dr. William Brice Buckingham, called by respondent, expressed the opinion that there was no causal relationship between Shamblin's work activities and the heart attack. To a similar effect was the testimony of James Damron, division manager for respondent, who testified that Shamblin's job involved no stress and was purely clerical in nature.

It is respondent's contention that the Commission's decision is against the manifest weight of the evidence. It alleges an absence of direct evidence of job stress which might have precipitated Shamblin's fatal heart attack. It argues further that the hypothetical question asked of claimant's expert witness was based on facts not supported by the evidence, referring specifically to that portion of the question which asked the witness to assume that Shamblin had been running about the truck yard and

broke out in perspiration on the day of his death. Respondent claims that this portion of the question reflected testimony that was erroneously admitted by the arbitrator because it represented an attempt by claimant to impeach her own witness, and that the testimony, even if admissible, could be used for impeachment purposes only and could not be considered as substantive evidence and used in a hypothetical question. Respondent concludes its argument by saying that claimant's expert witness unreasonably inferred from facts stated in the allegedly defective hypothetical question that Shamblin was under stress which resulted in his death. Various evidentiary issues are subsumed in these points raised by respondent, and each will be addressed to the extent necessary, following a brief review of workmen's compensation law as it relates to heart attacks.

The law applicable in cases such as this in which an employee suffers a heart attack was recently reviewed extensively in the opinion in *County of Cook v. Industrial Com.* (1977), 69 Ill. 2d 10. We will not duplicate that effort, but we do quote those portions necessary to a decision here:

"If an employee's existing physical structure gives way under the stress of his usual labor, his death is an accident which arises out of his employment. To come within the statute the employee need only prove that some act or phase of the employment was a causative factor of the resulting injury. *Wirth v. Industrial Com.* (1974), 57 Ill. 2d 475, 481.

\*\*\* The sole limitation to the above general rule is that where it is shown the employee's health has so deteriorated that any normal daily activity is an overexertion, or where it is shown that the activity engaged in presented risks no greater than those to which the general public is

exposed, compensation will be denied. (*County of Cook v. Industrial Com.* (1977), 68 Ill. 2d 24, 32-33; *Rock Road Construction Co. v. Industrial Com.* (1967), 37 Ill. 2d 123, 127; *Illinois Bell Telephone Co. v. Industrial Com.* (1966), 35 Ill. 2d 474, 477.) Whether, however, the above factors are present is a question of fact for the Commission. *Okaw Homes, Inc. v. Industrial Com.* (1968), 40 Ill. 2d 81, 84." 69 Ill. 2d 10, 17-18.

Our review of the record leads us to conclude that the arbitrator erred in admitting vital testimony and that, without this evidence, the Commission's decision has no factual basis, and its award must be set aside.

The objectionable evidence is the testimony of claimant herself in which she stated that her own witness, Mrs. Jendrach, allegedly once said that Shamblin was running about the truck yard and broke out in perspiration shortly before his death. This constituted an attempt by claimant to impeach her own witness, a course of action which has long been condemned by our cases, both civil and criminal. (*People v. Wesley* (1959), 18 Ill. 2d 138, 150; *People v. Johnson* (1924), 314 Ill. 486, 493; *American Hoist & Derrick Co. v. Hall* (1904), 208 Ill. 597, 601; *Rockwood v. Poundstone* (1865), 38 Ill. 199, 201.) Furthermore, this out-of-court testimony could not be used as substantive evidence in this case. *People v. Bailey* (1975), 60 Ill. 2d 37, 42-44; *People v. Gant* (1974), 58 Ill. 2d 178, 183; *People v. Collins* (1971), 49 Ill. 2d 179, 194.

Seeking to avoid application of the rule that one cannot impeach one's own witness, claimant alleges error in the arbitrator's refusal to declare Mrs. Jendrach hostile. We find no abuse of discretion, however, in this ruling by the arbitrator. While the testimony of Mrs. Jendrach may have been unsatisfactory or disappointing to claimant, we find no surprise or other showing of hostility to support

the result which claimant sought. See 58 Ill. 2d R. 238.

Because this portion of Mrs. Shamblin's testimony was not admissible, it was also error to allow reference to it in the hypothetical question given to claimant's expert witness. When an expert witness is asked to assume certain matters to be true, those matters must be "within the realm of circumstantial or direct evidence, as supported by the facts or reasonable inferences." (*Guardian Electric Manufacturing Co. v. Industrial Com.* (1973), 53 Ill. 2d 530, 535, citing *Gus T. Handge & Son Painting Co. v. Industrial Com.* (1965), 33 Ill. 2d 201, 206.) Because the testimony was not admissible, it could not be considered by an expert witness in formulating an opinion.

Without this testimony, we find no basis for the Commission's finding of causation between Shamblin's work and heart attack. We recognize, as claimant argues, that we are reluctant to reverse the Commission's decisions that are based on a weighing of conflicting evidence. Without this particular testimony of claimant, however, we find no conflict in the evidence, as we disagree with claimant that other evidence in the record is sufficient to prove that the injury was job related.

It is claimant's argument in this regard that the decision of the Commission is supported by the testimony that Shamblin was behind in his work and was assisted by Mrs. Jendrach. The evidence cited, however, pertains to the pressures of everyday life, common to many of us, and is not indicative of any stress peculiar to Shamblin's duties. The essential proof of causation is therefore lacking. As this court said in *Rysdon Products Co. v. Industrial Com.* (1966), 34 Ill. 2d 326, 329, "That an employee is at his place of work when accidental injury occurs does not, standing alone, justify recovery; there must be a further showing that the injury was due to some cause connected with, or incidental to, the employment, rather than a cause completely unrelated to the employment." In *Illinois Bell*

*Telephone Co. v. Industrial Com.* (1966), 35 Ill. 2d 474, 477, a case involving a heart attack, the court said more specifically:

> "The Workmen's Compensation Act requires that an accidental injury or death, to be compensable, must not only be sustained in the course of the employment but must also arise out of it. *It must be of such character that it may be seen to have had its origin in the nature of, or have been incidental to, the employment, or it must have been the result of a risk to which, by reason of the employment, the injured employee was exposed to a greater degree than if he had not been so employed.* [Citation.] The mere fact that he was at work on the day of his heart attack and left early is not sufficient to establish a causal relationship between his employment and his subsequent death, nor is it enough, where one's heart has deteriorated so that any exertion becomes an overexertion, to merely show that he had engaged in some kind of physical activity before suffering the attack." (Emphasis added.)

In *County of Cook v. Industrial Com.* (1977), 69 Ill. 2d 10, 19, the court approved an award which was based on evidence of "increased work activities" and unfavorable working conditions. The employee in that case was a clerical worker in the Cook County treasurer's office, which was responsible for accepting payments on real estate tax bills. Evidence was introduced which indicated that the employee had a preexisting heart condition, that the tax payment deadline was approaching, that the employee and fellow workers handled between 2,000 and 3,000 taxpayers each day during the week preceding his death, and that the office became hot on those days. In approving the award, we said:

> "This case is clearly distinguishable from

those cases where the employee suffers a heart attack or stroke after walking four blocks (*Illinois Bell Telephone Co. v. Industrial Com.* (1966), 35 Ill. 2d 474), or after rising from a chair (*County of Cook v. Industrial Com.* (1977), 68 Ill. 2d 24), or after climbing a set of stairs (*D. Lelewer & Son v. Industrial Com.* (1965), 33 Ill. 2d 118). In those cases there was nothing to distinguish the work activity complained of from any other daily activity which was at least as stressful." 69 Ill. 2d 10, 19.

Our consideration of the evidence now before us leads us to conclude that this case is controlled by *Illinois Bell* and the other cases cited in which awards have been denied. Shamblin's work activities "presented risks no greater than those to which the general public is exposed" (*County of Cook v. Industrial Com.* (1977), 69 Ill. 2d 10, 18), and the award must therefore be set aside.

In summary, we hold that the Commission's decision was against the manifest weight of the evidence. The judgment of the circuit court is reversed and the award is set aside.

*Judgment reversed;*
*award set aside.*