(No. 77383.— )

ROSE LEONARDI, Adm'r of the Estate of Michela Lopez, Deceased, *et al.*, Appellants, v. LOYOLA UNIVERSITY OF CHICAGO *et al.*, Appellees.

*Opinion filed October 26, 1995.—Rehearing denied December 4, 1995.*

McMORROW, J., dissented from the denial of rehearing.

Power, Rogers & Smith, P.C., of Chicago (Joseph A. Power, Jr., David A. Novoselsky, Terrence J. Lavin and Linda A. Bryceland, of counsel), for appellants.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Michael A. Pollard, Thomas F. Tobin, John A. Krivicich, Michael T. Pfau and David G. Wix, of counsel), for appellee Loyola University of Chicago.

Cassiday, Schade & Gloor, of Chicago (Michael J. Morrissey, Jennifer A. Keller and Carolyn Quinn, of counsel), for appellees Kanteerava Balasaraswathi *et al.*

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiffs, Rose Leonardi, as administrator of the estate of Michela Lopez, and Francesco Lopez, brought a medical malpractice action in the circuit court of Cook County. Defendants included Loyola University of Chicago and several additional corporations and individual physicians. The trial court entered judgment on a jury verdict in favor of defendants.

The appellate court affirmed. (262 Ill. App. 3d 411.) We allowed plaintiffs' petition for leave to appeal (145 Ill. 2d R. 315(a)), and now affirm the appellate court.

## BACKGROUND

The record shows that on the morning of September 1, 1979, decedent, Michela Lopez, was 36 years old and seven months pregnant. Her water broke and she was taken to a hospital. Decedent's attending physician, Dr. Thomas Tierney, had her transferred to Foster G. McGaw Hospital at Loyola University Medical Center (Loyola). Loyola was better able to deal with the most premature infants in need of intensive services and equipment. Decedent herself was not ill or at risk. However, her pregnancy was considered high risk, which required monitoring, due to the age of the fetus and because her water broke prematurely.

On the night of September 3, a nurse noticed heavy bleeding from decedent's vagina and paged a doctor. Dr. Joseph Coughlin, a Loyola resident, arrived seconds later and determined that decedent was hemorrhaging. Dr. John Gallagher, the senior Loyola resident on call that evening, arrived seconds after Dr. Coughlin. As senior resident, Dr. Gallagher supervised and managed a case until he received specific instructions from the attending physician or the attending physician was physically present.

At 9:35 p.m., Dr. Gallagher had decedent transferred

to the labor and delivery room. The transfer was accomplished in less than two minutes. Decedent was in hypovolemic shock due to the loss of blood. She was receiving intravenous fluids less than three minutes after being brought to the labor and delivery room. Decedent's condition stabilized. She was alert with normal signs.

Dr. Tierney was not at the hospital when decedent was admitted. However, he instructed Loyola staff by telephone not to perform a Cesarean section until he arrived. Dr. Tierney also ordered Dr. Gallagher to perform a vaginal inspection. Dr. Gallagher's examination confirmed the existence of a placenta previa. This is a condition where the placenta is found in the lower part of the uterus rather than in its normal place in the upper part of the uterus. Where the condition is present, the placenta is partially in front of the infant, obstructing the cervix and thereby preventing the infant from coming through the cervix.

Dr. Tierney arrived at the hospital and, assisted by Dr. Henry Davis, a Loyola resident, performed a Cesarean section on decedent. At 9:58 p.m., decedent gave birth to a two-pound baby girl, Rose Angela Lopez.

When Dr. Tierney attempted to remove the placenta, massive bleeding occurred. A portion of decedent's uterine wall came away with placenta that adhered to it. Decedent again went into hypovolemic shock. Dr. Tierney discovered a placenta accreta, which is an abnormal adherence of the placenta to the uterine wall. The condition required Dr. Tierney to perform a hysterectomy. The massive bleeding continued during the operation. However, at the end of the Cesarean section and hysterectomy, decedent was awake, her blood pressure and pulse were stable, and her urine output was satisfactory.

Drs. Kanteerava Balasaraswathi and Wanda Ma-

zurek administered general anesthesia for the surgery. Dr. Balasaraswathi extubated decedent, *i.e.*, removed the endotracheal tube that connected decedent to the respirator. Decedent was transferred to the recovery room, where she was given supplemental oxygen by mask. She was in critical but stable condition.

On September 4, at 6 a.m., Dr. Roberta Karlman, a Loyola resident, ordered that decedent's oxygen mask be removed. Dr. Karlman planned to get decedent back to breathing normal air. At 8 a.m., decedent began to grow restless. By 9:30 a.m., decedent had cyanotic lips and was perspiring heavily, was restless, and complained of abdominal pain. These symptoms were consistent with a patient who recently underwent a large abdominal procedure and experienced massive blood loss. At 10:30 a.m., a blood gas test revealed that decedent was experiencing respiratory difficulties. Decedent was given supplemental oxygen by mask, which appeared to stabilize her.

However, at approximately 11 a.m., decedent's blood pressure dropped significantly. At 11:35 a.m., decedent suffered respiratory arrest. The doctors believed that the cause was a saddle block pulmonary embolus, which is a blood clot at the point of separation of two blood vessels. Until this time, decedent had not shown any signs of pulmonary embolism.

At 11:40 a.m., Dr. Roque Pifarre performed an emergency pulmonary embolectomy. The operation required Dr. Pifarre to break decedent's sternum and massage the embolus, which had lodged at the very beginning of the pulmonary artery and impeded blood flow to the arteries. The clot broke into many pieces that dispersed through the arteries. Decedent's life was saved, but she suffered irreversible brain damage. She was discharged from Loyola over a year later, on October 17, 1980.

On October 20, 1980, decedent was admitted to the

Norridge Nursing Center. During her stay there, decedent could not independently perform any activity of daily living, *e.g.*, walking, eating, dressing, etc. She lacked bladder and bowel control. Although she could smile when happy, she could not articulate words; she could make only unintelligible noises. Decedent's arms and legs were severely bent and were unable to be straightened. Decedent would cry out in pain when her arms and legs were moved for physical therapy. Decedent died on January 25, 1985.

Plaintiffs eventually filed a fourth-amended complaint against several defendants, including Loyola and certain resident physicians, Drs. Gallagher, Coughlin, Davis, and Mazurek; and Dr. Balasaraswathi and his corporate employer. Dr. Tierney died subsequent to the bringing of this lawsuit; his estate was substituted as a defendant. Prior to jury selection, plaintiffs settled with Dr. Tierney's estate, which was dismissed from this lawsuit.

The complaint contained survival counts that alleged damages for injuries to decedent as a result of the negligent Cesarean section, administration of anesthesia for the Cesarean section, and resuscitation. The complaint also contained wrongful death counts that alleged damages for injuries to decedent's next of kin as a result of the same negligent acts.

The jury returned a verdict for defendants and the trial court entered judgment thereon. The appellate court affirmed. (262 Ill. App. 3d 411.) Plaintiffs appeal. We will refer to additional pertinent facts as they relate to the issues plaintiffs raise before this court.

## DISCUSSION

Plaintiffs present four issues in this appeal. They contend the trial court erred by: (1) allowing defendants to present evidence of Dr. Tierney's conduct, despite that he was not a party at trial; (2) tendering to the jury

an instruction on sole proximate cause; and (3) permitting defendants to improperly cross-examine plaintiffs' medical experts. Plaintiffs also contend (4) that the jury's verdict was against the manifest weight of the evidence.

## I. Evidence of Dr. Tierney's Conduct

Plaintiffs assign error to the trial court's evidentiary rulings on (A) a motion *in limine* and (B) a hypothetical question to an expert witness, both regarding the conduct of Dr. Tierney. Of course, the admissibility of evidence is a matter for the sound discretion of the trial court, and its decision will not be reversed on appeal unless that discretion has been clearly abused. *Gill v. Foster* (1993), 157 Ill. 2d 304, 312-13.

## A. *Motion In Limine*

Prior to trial, the trial court denied plaintiffs' motion *in limine* to bar the introduction of evidence regarding the alleged negligence of any person other than the named defendants. At trial, the court allowed defendants to question several witnesses regarding Dr. Tierney's duties and responsibilities as decedent's attending physician. The appellate court upheld the trial court's ruling. 262 Ill. App. 3d at 415-16.

Plaintiffs contend that evidence of Dr. Tierney's conduct was irrelevant and, therefore, inadmissible. Indeed, plaintiffs oppose the concept of the "empty chair" defense, also known as and hereafter referred to as the sole proximate cause defense. This defense seeks to defeat a plaintiff's claim of negligence by establishing proximate cause in the act of solely another not named in the suit. *Hall v. Clark* (Mo. 1957), 298 S.W.2d 344, 348; *Fabian v. Minster Machine Co.* (1992), 258 N.J. Super. 261, 276-77, 609 A.2d 487, 495.

In attacking the sole proximate cause defense, plaintiffs rely on the common law principle that there

can be more than one proximate cause of an injury, and that a person is liable for his or her negligent conduct whether it contributed wholly or partly to the plaintiff's injury *as long as it was one of the proximate causes of the injury. (Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 88.) A person *who is guilty of negligence* cannot avoid responsibility merely because another person is guilty of negligence that contributed to the same injury. *Where such guilt exists*, it is no defense that some other person or thing contributed to the injury. Thus, evidence of another person's liability is irrelevant to the issue of defendant's guilt. See *Kochan v. Owens-Corning Fiberglass Corp.* (1993), 242 Ill. App. 3d 781, 788-89, quoting *Lipke v. Celotex Corp.* (1987), 153 Ill. App. 3d 498, 509.

Plaintiffs' reliance on this principle is misplaced. This principle presumes that a defendant's conduct is at least *a* proximate cause of the plaintiff's injury. (See Restatement (Second) of Torts § 433B, Comment *g* (1965).) In the present case, defendants denied that they were even partly a proximate cause of plaintiffs' injuries. Rather, the defense theory was that Dr. Tierney was the sole proximate cause of plaintiffs' injuries.

Plaintiffs insist that defendants' general denial of negligence is insufficient to raise the sole proximate cause defense. Plaintiffs maintain "that defendants should be required to plead sole proximate cause of a non-party as an affirmative defense."

This contention is erroneous. In any negligence action, the plaintiff bears the burden of proving not only duty and breach of duty, but also that defendant proximately caused plaintiff's injury. (*Smith v. Eli Lilly & Co.* (1990), 137 Ill. 2d 222, 232; see 1 M. Polelle & B. Ottley, Illinois Tort Law § 14.23 (2d ed. 1994).) The element of proximate cause is an element of the *plaintiff's* case. The defendant is not required to plead lack of

proximate cause as an affirmative defense. (*Korando v. Uniroyal Goodrich Tire Co.* (1994), 159 Ill. 2d 335, 344 (products liability).) Obviously, if there is evidence that negates causation, a defendant should show it. However, in granting the defendant the privilege of going forward, also called the burden of production, the law in no way shifts to the defendant the burden of proof. See *Caley v. Manicke* (1961), 29 Ill. App. 2d 323, 328-29, *rev'd on other grounds* (1962), 24 Ill. 2d 390; M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 301.4 (6th ed. 1994).

Based on these principles, we agree with the appellate court that "an answer which denies that an injury was the result of or caused by the defendant's conduct is sufficient to permit the defendant in support of his position to present evidence that the injury was the result of another cause" (*Simpson v. Johnson* (1977), 45 Ill. App. 3d 789, 795), and so hold. Accord *Burrows v. Jacobsen* (1981), 209 Neb. 778, 782, 311 N.W.2d 880, 883-84; *Clement v. Rousselle Corp.* (Fla. Dist. Ct. App. 1979), 372 So. 2d 1156, 1158; *Dickman v. Truck Transport, Inc.* (Iowa 1974), 224 N.W.2d 459, 467; *Birmingham v. Smith* (Mo. 1967), 420 S.W.2d 514, 516-17.

Citing *Ruesch v. Richland Memorial Hospital* (1994), 260 Ill. App. 3d 49, plaintiffs argue that the sole proximate cause defense distracts a jury's attention from the simple issue of whether a named defendant caused, wholly or partly, a plaintiff's injury. We disagree. The sole proximate cause defense merely focuses the attention of a properly instructed jury (which instruction we will discuss later) on the plaintiff's duty to prove that the defendant's conduct was a proximate cause of plaintiff's injury. (See *Fabian*, 258 N.J. Super. at 276-77, 609 A.2d at 495.) Decisions that contain statements to the contrary, such as in *Ruesch*, are overruled on this point.

We cannot say that the trial court clearly abused its discretion in denying plaintiffs' motion *in limine.* Consequently, we find no error in defendants' questioning of witnesses concerning Dr. Tierney's duties and responsibilities.

### B. *Hypothetical Question*

Plaintiffs also argue that the trial court erred by refusing to strike a hypothetical question regarding Dr. Tierney's conduct. As part of their case in chief, plaintiffs called a defendant, Dr. Balasaraswathi, one of decedent's anesthesiologists. (See 735 ILCS 5/2—1102 (West 1994).) He testified as follows. On September 4, 1979, at 9:30 a.m., when decedent had cyanotic lips and was perspiring heavily, was restless, and complained of abdominal pain, the physician or nurse who was taking care of decedent should have, based on accepted medical practice, immediately administered to decedent oxygen and a blood gas test. Decedent's symptoms indicated, *inter alia,* a pulmonary embolism.

During defendants' cross-examination, Dr. Balasaraswathi testified that Dr. Tierney was decedent's treating physician. Also, Dr. Balasaraswathi was referring in his direct examination to Dr. Tierney as someone who might have deviated from the standard of care. Defense counsel then asked Dr. Balasaraswathi:

"Q. Now if—and I will connect this up, your Honor.

If Dr. Tierney was notified, and an obstetrical resident was there and wanted to draw a blood gas, and Dr. Tierney countermanded the order and told the obstetrical resident that she could not, it would be Tierney who was causing that blood gas not to be drawn; is that right?"

After a sidebar on plaintiffs' objection, defendants' cross-examination continued:

"THE COURT: *** You may read the question back, please.

\* \* \*

THE WITNESS: Yes, sir.

[Defense Counsel:] And if the failure to have a blood gas was a deviation from the standard, then the one who prevented it from being drawn would be the one who had deviated; is that correct?

A. That's right."

At the close of the evidence, the trial court denied plaintiffs' motion to strike the hypothetical question. Plaintiffs view the hypothetical question as stating that at 9:30 a.m. on September 4, 1979, Dr. Tierney countermanded an order issued by a resident to obtain a blood gas sample. Plaintiffs contend that the hypothetical question was not supported by the record and, consequently, the trial court erred by refusing to strike it.

Counsel has a right to ask an expert witness a hypothetical question that assumes facts that counsel perceives to be shown by the evidence. (*Coriell v. Industrial Comm'n* (1980), 83 Ill. 2d 105, 110.) The assumptions contained in the hypothetical question must be based on direct or circumstantial evidence, or reasonable inferences therefrom. (*Smith's Transfer Corp. v. Industrial Comm'n* (1979), 76 Ill. 2d 338, 350.) The hypothetical question should incorporate only the elements favoring his or her theory, and should state facts that the interrogating party claims have been proved and for which there is support in the evidence. On cross-examination, the opposing party may substitute in the hypothetical those facts in evidence that conform with the opposing party's theory of the case. *Coriell*, 83 Ill. 2d at 110-11.

It is within the sound discretion of the trial court to allow a hypothetical question, although the supporting evidence has not already been adduced, if the interrogating counsel gives assurance it will be produced and connected later. Evidence admitted upon an assurance that it will later be connected up should be excluded upon failure to establish the connection. *Coriell*, 83 Ill. 2d at 111; *People v. Smith* (1912), 254 Ill. 167, 173-74.

Applying these principles to the present case, we agree with the appellate court that the hypothetical question at issue had sufficient support in the evidence. However, more evidence was required to support the hypothetical question than what the appellate court cited. As a reviewing court, we can sustain the decision of a lower court on any grounds which are called for by the record, regardless of whether the lower court relied on those grounds and regardless of whether the lower court's reasoning was correct. *Bell v. Louisville & Nashville R.R. Co.* (1985), 106 Ill. 2d 135, 148; see *Werner v. Botti, Marinaccio & DeSalvo* (1990), 205 Ill. App. 3d 673, 679.

The appellate court cited the testimony of plaintiffs' expert, Dr. Hau Kwaan, and of Dr. Balasaraswathi. (262 Ill. App. 3d at 416.) Dr. Kwaan testified that Dr. Tierney, as the treating physician, was in charge of decedent and was responsible for whatever was necessary to be done. Thus, according to Dr. Kwaan, a resident was required to follow Dr. Tierney's orders.

However, the appellate court misapprehended the testimony of Dr. Balasaraswathi. He testified that on September 4, 1979, at 9:30 a.m., Dr. Tierney might have deviated from the standard of care by *failing to immediately administer* to decedent a blood gas test. The appellate court characterized Dr. Balasaraswathi as testifying that Dr. Tierney deviated from the standard of care by *preventing* a blood gas test from being taken. We earlier quoted the disputed hypothetical question to Dr. Balasaraswathi. As is seen, the reference to preventing the blood gas test from being taken was not Dr. Balasaraswathi's testimony; rather, it was a continuation of the hypothetical question itself.

In sum, the expert testimony establishes at most that: (1) Dr. Tierney might have deviated from the standard of care by failing to immediately administer a blood

gas test, and (2) a resident was required to follow Dr. Tierney's orders. This testimony, alone, does not support the hypothetical question that Dr. Tierney *countermanded a resident's order* to take a blood gas test.

However, defendants sought to further support the hypothetical question with the additional testimony of two Loyola senior residents, Drs. John Payne and John Gianopoulos, and a Loyola resident, Dr. Marguerita Hefti. Sustaining plaintiffs' objections, the trial court ruled that the portions of their testimony that related to the hypothetical question were inadmissible hearsay. Defendants made offers of proof of the excluded testimony.

Dr. Payne testified in an offer of proof as follows. On the morning of September 4, 1979, Dr. Payne was paged to come to decedent's bedside. Dr. Hefti paged Dr. Payne because she had a dispute with Dr. Tierney. Dr. Hefti wanted to test decedent's blood gases, but Dr. Tierney did not. Dr. Payne contacted the department chairman, who ordered Dr. Payne to see the patient and render the appropriate care.

Dr. Gianopoulos testified in an offer of proof as follows. On the morning of September 4, he accompanied Dr. Payne to decedent's bedside. Later that morning, Dr. Hefti told Dr. Gianopoulos that at 9:30 a.m., she believed that decedent should have received a blood gas test. However, Dr. Tierney ordered her not to do anything until Dr. Nemickas arrived. Dr. Hefti was frustrated because she had never heard of that physician.

Dr. Hefti testified in an offer of proof as follows. She did not remember the exact exchange between herself and Dr. Tierney, or exactly what she said to Dr. Gianopoulos. However, she did remember speaking to Dr. Gianopoulos at decedent's bedside, and that the conversation involved both Dr. Tierney and the identity of Dr. Nemickas.

Defendants assign error to the trial court's exclusion of this testimony. We agree. The principles are quite settled. An out-of-court statement that is offered as proof of the matter asserted in court is hearsay and, therefore, inadmissible. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 121.) The distinction between admissible testimony and inadmissible hearsay is illustrated by the "example of the witness A testifying that 'B told me that event X occurred.' If A's testimony is offered for the purpose of establishing that B said this, it is clearly admissible—if offered to prove that event X occurred, it is clearly inadmissible." *Carpenter*, 28 Ill. 2d at 121.

The record in the present case shows that defendants did *not* offer the testimony of Drs. Payne, Gianopoulos, and Hefti to establish that the event, *i.e.*, the substance of the conversation between Drs. Tierney and Hefti, occurred. Rather, defendants offered the testimony to establish what those residents did and why they acted as they did. This evidence was to be additional circumstantial evidence to support defendants' hypothetical question to Dr. Balasaraswathi. When an out-of-court statement is used not as evidence of the fact asserted, but as circumstantial evidence for another purpose, the hearsay rule does not apply. See *Reynolds v. Alton & Southern Ry. Co.* (1983), 115 Ill. App. 3d 88, 98; *Smith v. Solfest* (1978), 65 Ill. App. 3d 779, 782-83; *Goshey v. Dunlap* (1973), 16 Ill. App. 3d 29, 34.

True, defendants' hypothetical question to Dr. Balasaraswathi was not supported by direct evidence of the exact exchange between Drs. Hefti and Tierney. Dr. Tierney and the decedent are dead, and Dr. Hefti does not remember. However, we conclude that the hypothetical question was connected up to sufficient circumstantial evidence of record and reasonable inferences from the direct and circumstantial evidence, including the proffered testimony of the Loyola residents. After care-

fully reviewing the entire record, we cannot say that the trial court clearly abused its discretion in refusing to strike the hypothetical question.

## II. Sole Proximate Cause Instruction

In a related contention, plaintiffs claim that the trial court erred by tendering to the jury an instruction on sole proximate cause. A litigant has the right to have the jury clearly and fairly instructed upon each theory which was supported by the evidence. (*Ervin v. Sears, Roebuck & Co.* (1976), 65 Ill. 2d 140, 145.) However, it is error to give an instruction not based on the evidence. (See *Black v. Peoria Marine Construction Co.* (1987), 160 Ill. App. 3d 357, 365; *Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 929.) The question of what issues have been raised by the evidence is within the discretion of the trial court. The evidence may be slight; a reviewing court may not reweigh it or determine if it should lead to a particular conclusion. (See *Burge v. Morton* (1981), 99 Ill. App. 3d 266, 269.) The test in determining the propriety of tendered instructions is whether the jury was fairly, fully, and comprehensively informed as to the relevant principles, considering the instructions in their entirety. *Saunders v. Schultz* (1960), 20 Ill. 2d 301, 314.

The trial court tendered to the jury the long version of Illinois Pattern Jury Instructions, Civil, No. 12.04 (3d ed. 1989) (hereinafter IPI Civil 3d No. 12.04):

> "More than one person may be to blame for causing an injury. If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.
>
> [However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant.]"

Plaintiffs contend the trial court erred in tendering the second paragraph of this instruction for two reasons. Plaintiffs first argue that defendants did not plead the sole proximate cause of Dr. Tierney as an affirmative defense.

We cannot accept this argument. As we held previously, a defendant need not plead the sole proximate cause of another as an affirmative defense; rather, a general denial of any proximate cause is sufficient for the defendant to raise the defense. A defendant has the right not only to rebut evidence tending to show that defendant's acts are negligent and the proximate cause of claimed injuries, but also has the right to endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries. Further, if the evidence is sufficient, the defendant is entitled to an instruction on this theory. See *French v. City of Springfield* (1972), 5 Ill. App. 3d 368, 374.

Plaintiffs also argue that the record contained no evidence that supports the second paragraph of IPI Civil 3d No. 12.04. We cannot accept this argument. The notes to the instruction state: "The second paragraph should be used only where there is evidence tending to show that the sole proximate cause of the occurrence was the conduct of a third person." (IPI Civil 3d No. 12.04, Notes on Use, at 12—9.) "Whether the jury would have been persuaded is not the question. All that is required to justify the giving of an instruction is that there be some evidence in the record to justify the theory of the instruction." *Lowe v. Norfolk & Western Ry. Co.* (1984), 124 Ill. App. 3d 80, 118.

At the jury instruction conference, the trial court found that the record contained sufficient evidence of Dr. Tierney's involvement to justify giving the second paragraph of the instruction. We cannot say that the

court abused its discretion. After carefully reviewing the instructions in their entirety, we conclude that the jury was fairly, fully, and comprehensively informed as to the relevant legal principles.

### III. Defendants' Cross-Examination of Plaintiffs' Experts

Plaintiffs next contend that the trial court erred by permitting defendants to improperly cross-examine plaintiffs' two medical experts, Drs. Kwaan and Ronald Wender. Plaintiffs contend that defendants' cross-examination: (A) violated Illinois Supreme Court Rule 220(d), and (B) was generally improper. We note that the scope of cross-examination rests within the sound discretion of the trial court and will not be disturbed on appeal absent abuse of that discretion. *Sweeney v. Matthews* (1970), 46 Ill. 2d 64, 71.

Prior to trial, the parties conducted discovery of experts pursuant to Illinois Supreme Court Rule 220 (134 Ill. 2d R. 220 (repealed effective January 1, 1996)). Plaintiffs, in their answers to defendants' supplemental interrogatories, disclosed Dr. Wender as an expert witness, who would opine that defendants deviated from the applicable standard of care in several respects.

At trial, on direct examination, Dr. Wender's testimony did not exceed plaintiffs' responses in the Rule 220 interrogatories. He did not offer any opinions on whether defendants' alleged deviations proximately caused decedent's death. However, on cross-examination, the trial court allowed defense counsel to question Dr. Wender on the issue of proximate cause. Also, defendants cross-examined Dr. Kwaan regarding a portion of Dr. Wender's pretrial deposition, in which Dr. Wender opined that he was not sure that decedent had a pulmonary embolism.

## A. *Rule 220*

Rule 220(d) states:

"Scope of Testimony. To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings through interrogatories, depositions or requests to produce, his direct testimony at trial may not be inconsistent with or go beyond the fair scope of the facts known or opinions disclosed in such discovery proceedings. However, he shall not be prevented from testifying as to facts or opinions on matters regarding which inquiry was not made in the discovery proceedings." 134 Ill. 2d R. 220(d) (repealed effective January 1, 1996).

On appeal, plaintiffs contend that defendants' cross-examination of Drs. Wender and Kwaan violated Rule 220(d). Plaintiffs contend that they disclosed in their answers to defendants' Rule 220 interrogatories what Dr. Wender would testify to at trial. Plaintiffs argue that defendants' cross-examination of Dr. Wender on the issue of proximate cause, and defendants' cross-examination of Dr. Kwaan regarding Dr. Wender's deposition testimony on the subject of decedent's pulmonary embolism, exceeded the scope of Dr. Wender's disclosed opinions.

We cannot accept this contention. Rule 220(d) expressly limits only the expert's "direct testimony" at trial to the expert's responses during discovery. We agree with the appellate court in *Chiricosta v. Winthrop-Breon* (1994), 263 Ill. App. 3d 132, that Rule 220 is a limitation on the party calling the expert as a witness. The rule should not be read "to mean that the opposing party would be restricted from asking questions which were otherwise relevant because an expert witness had limited his answers to interrogatories or whose discovery deposition might have been limited." 263 Ill. App. 3d at 156.

The plain language of Rule 220(d) accords with an important purpose of discovery generally—to allow an

opposing party to effectively cross-examine an expert witness. "The principal safeguard against errant expert testimony is cross-examination." (*Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 407.) Effective cross-examination of an expert witness requires advance preparation. The lawyer, even with the help of the lawyer's own experts, frequently cannot anticipate the particular approach the adversary's expert will take or the data on which the expert will base an opinion at trial. (28 U.S.C.A., Fed. R. Civ. P. 26(b)(4), Advisory Committee Note, 1970 Amendment, at 29 (West 1992); Graham, *Discovery of Experts Under Rule 26(b)(4) of the Federal Rules of Civil Procedure: Part One, An Analytical Study*, 1976 U. Ill. L.F. 895, 897.) Similarly, the purpose of our Rule 220(d) "is to permit litigants to ascertain and rely upon the opinions of experts *retained by their adversaries.*" (Emphasis added.) (134 Ill. 2d R. 220(d), Committee Comments, at 182.) Applying the restraints of Rule 220(d) to the party cross-examining an adversary's expert witness would thwart this recognized purpose.

In any event, Rule 220(d) plainly states also that the expert may testify at trial as to facts or opinions on matters that the expert was not asked during discovery. In the present case, Dr. Wender was not questioned during discovery regarding proximate cause. Thus, his testimony on the issue did not violate Rule 220. See *Fogarty v. Parichy Roofing Co.* (1988), 175 Ill. App. 3d 530, 541; *Crawford County State Bank v. Grady* (1987), 161 Ill. App. 3d 332, 340.

We also note that defendants' cross-examination of Dr. Kwaan regarding Dr. Wender's deposition did not violate Rule 220(d). True, plaintiffs did not disclose in their answers to defendants' Rule 220 interrogatories that Dr. Wender would offer an opinion on whether decedent had a pulmonary embolism. However, Dr. Wender testified on the subject in a pretrial deposition.

Rule 220(d) specifically includes depositions in referring to discovery proceedings; "discovery" is not limited to answers to interrogatories. Defendants' cross-examination of Dr. Kwaan regarding Dr. Wender's deposition testimony on the subject of decedent's pulmonary embolism did not exceed the scope of Dr. Wender's opinion disclosed during discovery.

## B. *Improper Cross-Examination*

In addition to their contentions based on Rule 220, plaintiffs contend that defendants' cross-examination of Drs. Kwaan and Wender was improper.

Plaintiffs contend that defendants could not cross-examine Dr. Kwaan regarding Dr. Wender's deposition testimony. We disagree. Dr. Kwaan testified that he had read Dr. Wender's deposition. It is not error to permit an expert to testify regarding reports or medical tests performed by other doctors, which the expert examined in reaching his or her own opinion. (See *Piano v. Davison* (1987), 157 Ill. App. 3d 649, 672.) "Similarly the expert may be cross-examined with respect to material reviewed by the expert but upon which the expert does not rely." (1 J. Strong, McCormick on Evidence § 13, at 56-57 (4th ed. 1992).) Accordingly, we agree with the appellate court that it was not error for defendants to cross-examine Dr. Kwaan regarding Dr. Wender's deposition.

Plaintiffs also contend that defendants' cross-examination of Dr. Wender on the issue of proximate cause was improper because it exceeded the scope of his direct testimony. As the appellate court observed, cross-examination is generally limited to the scope of the direct examination. However, circumstances resting within the witness' knowledge may be developed on cross-examination that explain, qualify, discredit, or destroy the witness' direct testimony, even though that

material may not have been raised on direct examination. *People v. Franklin* (1990), 135 Ill. 2d 78, 97.

In the present case, Dr. Wender opined on direct examination that defendants had deviated from the standard of care. On cross-examination, defendants asked Dr. Wender whether those deviations proximately caused decedent's injuries. As stated earlier, proximate cause was an essential element of plaintiffs' case, which they were required to establish through expert testimony. (See *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423.) Without that element, there would be no case. Defendants sought an answer from Dr. Wender that would explain, qualify, discredit, or destroy his direct testimony. We agree with the appellate court that it was not improper for defendants to ask the question. After carefully reviewing the record, we cannot say that the trial court abused its discretion in permitting defendants' cross-examination of Drs. Kwaan and Wender.

### IV. Manifest Weight of the Evidence

Plaintiffs lastly contend that the jury's verdict for defendants was against the manifest weight of the evidence. Plaintiffs do not attack the weight of the evidence. Rather, citing the alleged errors raised on appeal, plaintiffs argue that the trial was "tainted," which resulted in an "arbitrary" verdict. Consequently, they ask this court to reverse the judgment and remand the cause for a new trial.

A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent, or when the findings appear to be unreasonable, arbitrary, or not based on evidence. (*Bazydlo v. Volant* (1995), 164 Ill. 2d 207, 215.) After carefully reviewing the entire record, we cannot say that the jury's verdict for defendants was against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Affirmed.*

JUSTICE McMORROW dissented from the denial of rehearing.